627 A.2d 719

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Richard HACKETT, Appellant.**

Supreme Court of Pennsylvania,
Eastern District.

Argued Oct. 20, 1992.

Decided June 30, 1993.

214

Thomas A. Bergstrom, Philadelphia, for appellant.

Ronald Eisenberg, Deputy Dist. Atty., Catherine Marshall, Chief, Appeals Div., Hugh Burns, Asst. Dist. Atty., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Following a trial by jury in the Court of Common Pleas of Philadelphia County, the appellant, Richard Hackett, was convicted of murder of the first degree, aggravated assault, possession of an instrument of crime and criminal conspiracy.

On April 26, 1990, a sentence of death was imposed with respect to the murder conviction and terms of imprisonment were imposed for the other offenses. The present direct appeal ensued. We affirm.

Hackett's convictions arose as the result of a conspiracy which he led for the primary purpose of killing Gregory Ogrod. The evidence presented at trial established that, at 3:30 a.m. on July 31, 1986, three men armed with knives and a crowbar entered the basement of a home where they knew Gregory Ogrod and Maureen Dunne were sleeping. The men attacked the sleeping couple, repeatedly stabbing and clubbing them both. Maureen Dunne was stabbed to death in the heart; however, Ogrod managed to get up and struggle against the assassins, who fled at his display of resistance. As Ogrod watched the intruders running down his street, he recognized one of them as Marvin Spence. Spence was one of only a small number of people who knew Ogrod and Maureen Dunne would be found sleeping in the basement that night. Aside from Ogrod and his brother, only Hackett had a key to the front door of Ogrod's house.

This assault was the culmination of a conspiracy headed by Hackett and Spence, who were friends and wanted Ogrod killed. Hackett's antipathy toward Ogrod resulted from a living arrangement that went bad. Hackett moved into Ogrod's house in the spring of 1986 at the invitation of Ogrod's brother, who worked for Hackett in Hackett's landscaping business. Hackett did not get along with Ogrod and, in July 1986, Ogrod told him to leave. Hackett responded that he would throw Ogrod out of his own house if he failed to "cool out." A few days later, Ogrod returned home and found that Hackett had removed Ogrod's effects from Ogrod's upstairs bedroom to the basement and had taken Ogrod's refrigerator.

Spence's discontent with Ogrod grew out of a soured drug-dealing relationship. Spence had been Ogrod's partner in dealing illegal drugs, but their business relationship began to unravel when Spence began stealing money Ogrod had given him to buy drugs for resale. When Ogrod demanded restitution, Spence refused. The two men argued constantly for

about a month, during which time Spence threatened to kill Ogrod.

By the end of July, 1986, Hackett had made statements that he wanted harm to come to Ogrod. On July 7, 1986, Hackett had told Officer Anthony Daulerio that Ogrod was a "bad guy" who owed him money, that he wanted to "get" Ogrod but that Ogrod had "biker friends," and that Hackett was going to "get somebody to get" Ogrod. Hackett also had told his office receptionist, Heidi Guhl, who knew the people involved, that if Ogrod did not "watch himself, he was going to get hurt real bad." Ms. Guhl was concerned because Hackett had a paper on his desk with the phone number of Edgar Torres, a supposed middleman to hit-men, and with the address of Maureen Dunne, whom she knew, and who was always referred to by Hackett as "a bitch." In addition, on July 17, 1986, Ms. Arlene Horoschak spoke by phone with Hackett about her son, Jeffrey Horoschak, who was Ogrod's friend. Hackett told her to tell Jeffrey not to hang around Ogrod because "there's a contract out on Greg's life and anybody who's with him will be killed too."

Further, Hackett had asked Edgar Torres in the spring of 1986 if he could help Hackett find an assassin to "bump someone off for money," and assured Torres that he had money to pay. Hackett gave Torres pictures of Ogrod and Maureen Dunne and even met with Torres and a supposed assassin, a friend of Torres known only as "Ant." Finally, Torres admitted that he could not find any hit men, and told Hackett he was "giving it up."

By the end of July, 1986, Spence had made statements to Hackett's girlfriend, Wendi Rosenblum, and to David Carter that he wanted harm to come to Ogrod. In mid-July, Spence told Wendi Rosenblum that he was going to kill Ogrod and that, if Maureen Dunne got in the way, he was going to kill her too.

On July 28, 1986, Spence offered David Carter a "hit job." Spence showed him Ogrod's home and then took him to meet with Hackett who offered Carter $5,000 to kill Ogrod and also

a girl, a policeman's daughter (i.e., Maureen Dunne). Carter was reluctant and complained that since he would have to kill any potential witnesses, he was being asked to kill two people for the price of one. Hackett responded, "if you got to kill the bitch, kill the bitch," but offered no additional money. Carter then instructed "give me half now and half when I finish," but the conspirators had no money on hand, and instead gave Carter a down payment of a VCR. When Carter and Spence met on July 30, 1986, to discuss how an attack on the proposed victims should take place, Carter disagreed with the proposed attack and announced that he was "out of it" and went to bed.

The presence and involvement of Hackett and Spence at the scene of the attack was evidenced by testimony of Jeffrey Horoschak, Wendi Rosenblum and David Carter. Jeffrey Horoschak testified that when he called Ogrod's house at 1:45 a.m. on July 31, 1986, two hours before the murder, Hackett answered and told him Ogrod was asleep. At approximately 5 a.m. the same day, Hackett called his girlfriend, Wendi Rosenblum, at her apartment, and told her "Greg [Ogrod] is dead." Shortly thereafter, he arrived, sweating and shaking, at her apartment by coming through the basement of the building. He told Rosenblum to say to the police that he had been at her apartment all night. The next morning, Hackett asked Rosenblum to go to Torres, get the photographs he had given Torres, and throw them away. Approximately one week later, Rosenblum saw Hackett take a crowbar from her basement and conceal it in his pants. Later, Hackett threw the crowbar in a dumpster next to a convenience store.

Spence's involvement was shown by testimony from Carter. At 7 a.m. on July 31, 1986, Spence and co-conspirator James Gray, visited Carter and told him, "It's done ... We did it." Spence, obviously pleased, explained that, after arming themselves with knives and a crowbar and creeping up upon the sleeping victims, they just "hacked and stabbed whoever was down there." They left when "the white boy [Ogrod] jumped up" and ran at them. Spence was covered with blood as he gave this account to Carter.

Carter's testimony was corroborated by Edward May who testified that, at approximately 3:30 a.m. on July 31, 1986, he encountered co-conspirator Keith Barrett. Barrett arranged for May to give Barrett and his two friends, Spence and Gray, a ride to a location that was one block from Ogrod's house. There they met another man, similar in appearance to Hackett, with a pickup truck similar to that owned by Hackett. The murder occurred about one-half hour later, at approximately 4 a.m.

Hackett was found guilty by a jury of murder of the first degree,[1] aggravated assault, possession of an instrument of crime, and criminal conspiracy. As to the murder charge, the Commonwealth argued two aggravating circumstances: that Hackett had conspired to pay another person to kill the victim;[2] and, that Hackett had created a grave risk to another during the killing of the victim.[3] The jury found the two aggravating and no mitigating circumstances, and returned a sentencing verdict of death. Following the denial of a motion for a new trial, this direct appeal followed.

Although Hackett does not allege that the evidence is insufficient to sustain the verdict against him, this Court is required in capital cases to review the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Bryant*, 524 Pa. 564, 567, 574 A.2d 590, 592 (1990). Viewed in accordance with that standard, the evidence presented at trial as reflected above overwhelmingly estab-

---

1. *See,* 18 Pa.C.S. § 2502(a).

2. 42 Pa.C.S. § 9711(d)(2): "The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim."

3. 42 Pa.C.S. § 9711(d)(7): "In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."

lished Hackett's guilt. We conclude that there is sufficient evidence to sustain the verdict against Hackett.

Hackett first argues that the trial court erred in refusing to grant a new trial under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because the prosecutor's opening statement referred to facts allegedly proven only by the improperly redacted post-arrest statements of Hackett's conspirators and because the prosecutor improperly used hearsay. In *Bruton*, the Supreme Court held that the introduction of statements of a co-conspirator, made after the conspiracy had ended and not falling within a traditional hearsay exception, violated the accused's constitutional right to confront witnesses against him. The *Bruton* Court emphasized that the inquiry was whether the prosecutor's remarks in the context of the remaining evidence against the accused lent "substantial, perhaps critical weight" to the prosecutor's case. *Bruton*, 391 U.S. at 128, 88 S.Ct. at 1624. As a result of *Bruton*, the practice of redaction, the editing of a co-defendant's statement to remove all references to another defendant, was adopted. *See Commonwealth v. Chestnut*, 511 Pa. 169, 173, 512 A.2d 603, 605 (1986).

Hackett argues that the prosecutor's statement that Hackett gave the other conspirators weapons and told them the victim was asleep in the basement could "only" have been derived from the improperly redacted post-arrest statements of the co-conspirators. The record reflects otherwise. First, the prosecutor made no mention of the post-arrest statements of the co-conspirators in the opening statement, the jury heard only redacted statements during the trial which did not identify Hackett directly or by implication and both the prosecutor and the trial judge stated that the prosecutor's remarks did not constitute evidence.

Also, the prosecutor's assertions were supported by independent evidence, e.g., the testimony of Jeffrey Horoschak and Wendi Rosenblum and Hackett's own statements. Jeffrey Horoschak testified that when he called Ogrod's house at 1:45 a.m., two hours before the murder, Hackett answered and told

him Ogrod was asleep. Hackett's former girlfriend testified that, after the murder, Hackett had a crowbar which he threw in a dumpster and other testimony established that a crowbar had been used to attack Ogrod. The independent testimony later proved that Hackett knew where Ogrod slept, since it was Hackett himself who moved Ogrod into Ogrod's own basement and lived in the same house as Ogrod. Hackett's own statements during the course of the conspiracy established his intent to kill the victims and his efforts to bring about that end. The statements of the co-conspirators, in contrast, were redacted, and gave no indication as to who, among the four participants, did what. There was no *Bruton* violation.

Hackett's second argument under *Bruton* is that, during David Carter's testimony, the Commonwealth introduced supposedly "hearsay" evidence, over his objection, that co-defendants Spence and Gray came to Carter's house after the murder and stated, "It's done, we did it." Statements made by co-conspirators in their own presence following a crime have a strong indicia of spontaneity and reliability so as to comport with confrontation requirements and not to violate *Bruton. Commonwealth v. Lambert,* 529 Pa. 320, 335, 603 A.2d 568, 575 (1992). Statements within the conspiracy exception to the hearsay rule do not violate *Bruton. Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387 (1981).

Here, Gray and Spence were co-conspirators with Hackett. Their statements were highly reliable because they were made in each others' presence, in front of a third party who was not part of the conspiracy, and contrary to their own penal interests. The declarations were spontaneous and occurred very close in time to the murder. Further, this statement was an admission by Gray and Spence which made no mention of Hackett. Spence and Gray were merely describing their *own* actions during the murder. Since the declarations which Gray and Spence made to Carter immediately after the crime were admissible against Hackett as a co-conspirator without violation of the Confrontation Clause, *Bruton* is not implicated. The trial court did not err in denying relief.

 Hackett next argues that the trial court erred in refusing to give the jury an accomplice instruction with regard to Commonwealth witnesses David Carter, Edgar Torres, and Wendi Rosenblum. An "accomplice" charge advises the jury that if it finds that a Commonwealth witness was an accomplice of the accused, the jury should consider the testimony of the witness with caution. To be an accomplice within the meaning of 18 Pa.C.S. § 306, an individual "must have knowledge of, and *participate in,* the specific crime charged." *Commonwealth v. Thomas,* 479 Pa. 34, 38, 387 A.2d 820, 822 (1978) (emphasis added). Under 18 Pa.C.S. § 306(f), one who terminates his involvement prior to the commission of the crime, by definition, is not an accomplice.[4] Where the uncontradicted, corroborated evidence is that the supposed accomplice terminated his involvement before the commission of the crime, the accomplice instruction is not required. *Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147 (1990).

Here, the uncontradicted evidence was that David Carter, whom Hackett attempted to recruit to carry out the contract murder of Gregory Ogrod and Maureen Dunne, explicitly rejected the scheme before the crime was committed and did not participate in it in any way. Indeed, it was Carter's "I'm out of it" announcement on the night of July 30, 1986, that prompted Hackett and his friends to decide to carry out the contract murder themselves. Further, the evidence showed that Carter was not present when the murder occurred but was at home. The fact that Carter ended his involvement before the crime was committed was not only uncontradicted,

---

**4.** The subsection provides as follows:

 **(f) Exceptions.**—Unless otherwise provided by this title or by the law defining the offense, a person is not an accomplice in an offense committed by another person if:

 (1) he is a victim of that offense;

 (2) the offense is so defined that his conduct is inevitably incident to its commission; or

 (3) he terminates his complicity prior to the commission of the offense and;

 (i) wholly deprives it of effectiveness in the commission of the offense; or

 (ii) gives timely warning to the law enforcement authorities or otherwise makes proper effort to prevent commission of the offense.

but independently corroborated by the statements of co-conspirators Gray and Barrett, who did participate in the murder and who had nothing whatsoever to gain from such an assertion. These uncontradicted and corroborated facts, as a matter of law, established that Carter was not an accomplice.

Similarly, the uncontradicted facts pertaining to Edgar Torres also precluded, as a matter of law, any conclusion that he was Hackett's accomplice in the murder. Hackett approached Torres and asked him, in effect, to put him in touch with a paid assassin. Torres claimed he could, but failed, and finally told Hackett, long before the crime occurred, that Torres was "giving it up."

Also, the evidence established that Wendi Rosenblum was Hackett's girlfriend, that she knew of Hackett's intention to kill the victims and that she did not participate. Hackett argues that Rosenblum qualifies as an accomplice because, after the crime, she "harbored" Hackett, she lied to the police and retrieved and threw away photographs which Hackett had given Torres. An accessory after the fact is not an accomplice. *Commonwealth v. Scoggins*, 451 Pa. 472, 480, 304 A.2d 102, 107 (1973). Since all of her actions occurred after the crime, she could not have facilitated the commission of the crime and, therefore, she was not an accomplice under 18 Pa.C.S. § 306. The trial court did not err in refusing to give an accomplice instruction for David Carter, Edgar Torres and Wendi Rosenblum.

Hackett next argues that the trial court erred in its charge to the jury during the penalty phase by failing to instruct the jury they need not be unanimous in finding mitigating circumstances in accord with *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *Mills* concerned a Maryland statute which required jurors unanimously to agree on each individual mitigating circumstance after deciding aggravating factors. Absent unanimous agreement, the Maryland statute barred consideration of the mitigating evidence as to a given circumstance. The Supreme Court held that the statute violated the Eighth Amendment because a single Maryland

juror could force a death verdict on the other jurors by refusing to agree that mitigation existed.

■ The Pennsylvania statute, 42 Pa.C.S. § 9711, does the opposite and, therefore, does not violate the rule in *Mills*. The Pennsylvania statute, 42 Pa.C.S. § 9711(c)(1)(iv), requires that the jury unanimously agree that *no* mitigating circumstances exist and unanimously agree on a verdict for a sentence of death.[5] Thus, while a single Pennsylvania juror can always *prevent* a death sentence, a single juror can never *compel* one, as could a single juror under the former Maryland statute. Jury instructions in the penalty phase which follow the language of the death penalty statute do not recreate the error in *Mills*. *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575 (1991); *Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75 (1990); *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990); *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989).

Here, the trial court's instructions exactly followed the death penalty statute, 42 Pa.C.S. § 9711.[6] Indeed, Hackett concedes that the lower court "recited the language of the statute." The trial court did not err by following the statutory language.

In a separate argument unrelated to the above claim, Hackett complains that the jury was not given any "standards" by which to conduct the weighing of aggravating and mitigating circumstances, and speculates that the jury might merely have "added the number of aggravating circumstances without considering any mitigating circumstances." His claim is moot, since the jury unanimously found that there were *no* mitigating circumstances. No weighing was possible. Moreover, this

**5.** 42 Pa.C.S. § 9711(c)(1)(iv) provides that "[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstances ..."

**6.** Hackett argues that his claim is unique in that he does not question the constitutionality of the statute itself, but only the instructions given by the trial court. Since the trial court here followed the language of the statute, word for word in its instruction, this is hardly a distinction.

Court has rejected the notion that the jury must be given special instructions or "standards" for the weighing process. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

In another claim also unrelated to *Mills,* Hackett argues that he was prejudiced because the trial court read the entire statute to the jury, informing the jury of the full list of aggravating and mitigating circumstances, even though only two of the aggravating circumstances were supported by the evidence. A trial court's failure to indicate which of the statutory aggravating circumstances is supported by the evidence does not prejudice the offender. *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985). Indeed, such a practice is more prejudicial to the Commonwealth, which must prove any aggravating circumstance beyond a reasonable doubt. Here, the trial court indicated that it was merely reading the full list of statutory aggravating factors, that some of them might have no application, and that it would be up to the jury to decide which, if any, had been proven. Hackett complains that the jury "may have" been "confused" into deliberating unsupported aggravating factors but does not explain how this could have prejudiced him. These claims fail.[7]

Hackett finally argues that the trial court erred in failing to instruct the jury during the penalty phase of the trial that as a matter of law there could be no aggravating circum-

7. In a footnote, Hackett also claims that the lower court "instructed the jury" to "consider the defendants individually and collectively." The court merely indicated that it was using the term "the defendants" to include all four defendants, in order to avoid having to repeat each instruction four times, once for each defendant. Since conspiracy was the basis for the convictions and both aggravating circumstances, there was nothing misleading or improper in this. The court never instructed the jury to "consider" the defendants "collectively" as to the penalty verdict, and the verdict forms required the jury to return a specific verdict as to each individual defendant. Indeed, Barrett and Gray were given life imprisonment, not death. Defendant's verdict demonstrably did not affect them, and so the jury demonstrably did not produce a "collective" verdict.

stances for a contract killing since the victim was never the subject of such a contract. The aggravating circumstance of contract killing is found in 42 Pa.C.S. § 9711(d)(2) which provides: "The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of *the victim.*" [8] (emphasis added). In *Commonwealth v. Gibbs,* 533 Pa. 539, 626 A.2d 133 (1993), this Court held that this aggravating circumstance may not properly be considered by the jury when the victim killed was not the object of the contract to kill. This Court reasoned that the plain language of the statute requires that the person killed be the subject of the contract to kill. This Court also refused to adopt the common law "transferred intent" theory to bring an unintended killing within the meaning of 42 Pa.C.S. § 9711(d)(2) as this is a matter more appropriately dealt with by the General Assembly.

While Hackett correctly states the law, his argument is meritless since the evidence clearly reflects that one of the contemplated victims of Hackett's contract to kill was Maureen Dunne. The evidence reflects that Hackett made clear that if Maureen Dunne happened to be present when Gregory Ogrod was about to be killed, she would die as well. In

---

**8.** As a preliminary matter, the record reflects that Hackett entered a contract to kill by paying another person or contracting to pay another person for the killing of the victims. Hackett asked Edgar Torres to find someone to do the killing and offered to pay Torres a sum of money for the murder. Hackett then contracted with David Carter and paid him a down payment of a VCR. Thus, the record clearly reflects, as the trial court judge found, that a contract to kill existed for purposes of 42 Pa.C.S. § 9711(d)(2).

One might argue, even though Hackett does not, that § 9711(d)(2) should not apply where the acceptor/contractee refuses to perform the contract and, as a result, the offeror/contractor then performs the contract. The plain meaning of § 9711(d)(2) is that once the contract for the killing of the victim has been entered, § 9711(d)(2) is triggered provided causation exists. There is no requirement that the contractee perform the contract as long as the contract to kill directly caused and/or resulted in the killing. Here, Hackett entered into a contract to kill with Carter and gave Carter a VCR as consideration for the contract. Carter's refusal to perform the contract to kill directly caused and/or resulted in the killing of the victims by Hackett. Section 9711(d)(2) was properly applied in this case.

seeking to enlist the aid of Edgar Torres in finding a "hit man," Hackett gave Torres pictures showing not only Ogrod, but Maureen Dunne as well. Hackett's paper with Torres' telephone number also contained Ms. Dunne's address. In seeking to recruit David Carter to kill Ogrod, Hackett made it quite clear that the task included killing Maureen Dunne. The trial court did not err in concluding that the jury had more than sufficient evidence to find beyond a reasonable doubt that Hackett enlisted an assassin to kill *both* victims, not just Ogrod.

■ We now comply with our duty under 42 Pa.C.S. § 9711(h)(3)(iii) to review sentences of death from the standpoint of the proportionality to sentences imposed in similar cases. *Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961. We have reviewed the sentences imposed on Hackett in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984). We perceive no excess or disproportionality in the sentences imposed. Further, the record does not provide any basis for belief that the sentence of death was the "product of passion, prejudice or any other arbitrary factor." *See* 42 Pa.C.S. § 9711(h)(3)(i). Also, the evidence supports the finding of at least one aggravating circumstance specified in 42 Pa.C.S. § 9711(d). Accordingly, the sentences must be affirmed.

The order of the Court of Common Pleas of Philadelphia County is affirmed.[9]

CAPPY, J., files a concurring opinion.

LARSEN, J., did not participate in the consideration or the decision of this case.

CAPPY, Justice, concurring.

I concur.

9. The Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor, 42 Pa.C.S. § 9711(i).

I agree with the majority's statement that 42 Pa.C.S. § 9711(d)(2) allows a jury to find a contract to kill as an aggravating circumstance only if the killing is performed as a result of that contract;[1] however, I write separately to express my disagreement with the majority's conclusion that "Carter's refusal to perform the contract to kill directly caused and/or resulted in the killing of the victim by Hackett [and Spence]." (Majority op. at 225, n. 8.)

A brief review of the pertinent facts is necessary to illustrate my position. Hackett and Spence contracted with Carter to kill Ogrod.[2] In the course of their negotiations, they agreed that anyone with Ogrod at the time of the proposed killing (particularly the victim, Dunne) would also be killed so as to leave no witnesses. Ultimately, Hackett, Spence, and two other conspirators, Gray and Burnett, killed Dunne. Ogrod survived the attack.

However, as the majority notes, Carter had withdrawn from the conspiracy to kill by refusing to perform the contract the day before the killing. The majority opinion states that

the fact that Carter ended his involvement before the crime was committed was not only uncontradicted, but independently corroborated by the statements of co-conspirators Gray and Burnett, who did participate in the murder and who had nothing whatsoever to gain from such an assertion. These uncontradicted and corroborated facts, as a matter of law, established that Carter was not an accomplice.

(Majority op. at 221–222).

I agree that a contract to kill was formed among Hackett, Spence and Carter, and that the victim, Dunne, was a subject

1. I note that neither Hackett nor Spence raise this issue. However, I believe that we must consider it under our duty to automatically review the sufficiency of the evidence in capital cases. 42 Pa.C.S. § 9711(h), Pa.R.A.P.1941.

2. I acknowledge that the evidence is also sufficient to prove that Hackett and Spence contracted with another man, Torres, in that they hired Torres to help them find a "hit man." However, Torres "gave up" the endeavor well before the actual killing. As such, the majority's strongest argument relies on the contract with Carter, which I address *infra*.

of the contract to kill. I further agree with the majority's statement that

> [t]he plain meaning of § 9711(d)(2) is that once the contract for the killing of the victim has been entered, § 9711(d)(2) is triggered *provided causation exists.* There is no requirement that the contractee perform the contract *as long as the contract to kill directly caused and/or resulted in the killing.* Here, Hackett [and Spence] entered into a contract to kill with Carter and gave Carter a VCR as consideration for the contract.

(Majority op. at 225, n. 8 (emphasis added).) However, I cannot agree with the majority's conclusion that

> *Carter's refusal to perform the contract to kill directly caused and/or resulted in the killing of the victims* by Hackett [and Spence]. Section 9711(d)(2) was properly applied in this case.

(Majority op. at 225, n. 8 (emphasis added).)

The majority concedes that Carter did not participate in the actual killing as he had contracted. As such, it is clear that the majority does not argue that the killing occurred pursuant to the contract. However, it is not clear whether the majority's position is that it was the *creation of the contract* to kill Ogrod and Dunne, or *Carter's subsequent refusal to perform the contract* that directly resulted in the killing. After consideration of both positions, I am unable to agree with either, as I find that neither the creation of the contract itself nor Carter's refusal to perform the contract was the cause of the killing. In my view, causation must flow from the contract itself. At minimum, causation is implied in the words of section 9711(d)(2), i.e. a contract for *"the killing* of the victim." In my view, this clearly refers to the *actual* killing act, hence, the contract must be causally linked in order for this subsection to be satisfied.[3] The consequences of a contractee's refusal to perform the contract is irrelevant to our inquiry.

---

**3.** There is a long line of cases in Pennsylvania in the homicide causation context providing that causation cannot be established in the criminal context on a "but for" or civil law proximate cause basis. *See* Burkoff, Criminal Offenses and Defenses in Pa. (2nd ed.), p. 196.

Further, as there appears to be no evidence of a contract to kill between Hackett or Spence and any of the other actual participants in the killing, I disagree with the majority opinion to the extent that it finds that the aggravating circumstance of a contract killing has been sufficiently proven.

However, the result reached by the majority is a correct one as a review of the record reveals that Hackett was sentenced to death after the jury found two aggravating circumstances and no mitigating circumstances. The jury found the existence of aggravating circumstances under section 9711(d)(2) and section 9711(d)(7). While I disagree that the evidence is sufficient to support the finding of an aggravating circumstance under section 9711(d)(2), I agree that the finding of an aggravating circumstance under section 9711(d)(7) is supported by sufficient evidence. As the jury properly found at least one aggravating circumstance and no mitigating circumstances, the sentence of death was properly rendered. 42 Pa.C.S. § 9711(c)(iv); *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704 (1992).