Richard HACKETT, Petitioner,

v.

James PRICE, Superintendent SCI Green, et al. Respondents.

No. CIV. A. 99–5434.

United States District Court, E.D. Pennsylvania.

Aug. 6, 2001.

Norris E. Gelman, Philadelphia, PA, for Petitioner.

David Curtis Glebe, Office of the District Attorney, Philadelphia, PA, for Respondents.

### *MEMORANDUM*

PADOVA, District Judge.

Petitioner Richard Hackett has filed a counseled Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the guilt-determining and the penalty phases of his trial on six grounds. For the reasons that follow, the Court denies claims I, II, III, V, and VI of the Petition, but concludes that Petitioner is entitled to relief with respect to Claim IV alleging *Mills* error in the penalty phase. Accordingly, the Court grants the

Petition with respect to the penalty phase of the trial and vacates Petitioner's sentence without prejudice to the right of the Commonwealth of Pennsylvania to sentence Petitioner to life imprisonment, or to conduct such further proceedings as may be appropriate under state law (including a new sentencing hearing) if initiated within 180 days.

## I. BACKGROUND

The following recitation of the underlying factual allegations was set forth by the Pennsylvania Supreme Court. *See Hackett*, 534 Pa. 210, 627 A.2d 719. Petitioner's convictions arose from a conspiracy with the primary purpose of killing Gregory Ogrod ("Ogrod"). On July 31, 1986, at 3:30 a.m., three men armed with knives and a crowbar entered the basement of the home where they knew Ogrod and Ogrod's girlfriend, Maureen Dunne, would be sleeping. The men stabbed and clubbed the two victims. Maureen Dunne was stabbed to death, but Ogrod managed to escape. He recognized one of the perpetrators as Marvin Spence ("Spence"). *Id.* at 721–22. The other perpetrators were later identified as James Gray ("Gray") and Keith Barrett ("Barrett"). *Id.* at 722. Testimony also established the presence of Petitioner at the scene of the attack. *Id.*

The assault was the culmination of a conspiracy headed by Petitioner and Spence to murder Ogrod. Petitioner had moved into Ogrod's house in the spring of 1986 at the invitation of Ogrod's brother, who worked for Petitioner in his landscaping business. Petitioner did not get along with Ogrod. In July 1986, Ogrod told Petitioner to move out of the house. Petitioner refused, and a few days later removed all of Ogrod's effects to the basement. Spence also had a falling out with Ogrod over a dispute related to their business of selling drugs. Petitioner and Spence, who knew each other, both determined that they wanted Ogrod dead, and

Petitioner began to inquire into hiring someone to kill Ogrod and Dunne. *Id.*

Petitioner was charged with murder in the first degree, criminal conspiracy, possession of instruments of crime, and aggravated assault. Thomas Bergstrom was appointed trial counsel for Petitioner. In the summer of 1988, Petitioner, Spence, Gray, and Barrett were tried jointly in the Court of Common Pleas of Philadelphia County before the Honorable George J. Ivins. Petitioner is Caucasian, while his co-defendants are African–American. At trial, the evidence demonstrated the plan to be a conspiracy murder for hire. The jury convicted Petitioner on July 14, 1998, of the charged offenses. On July 16, 1988, following a sentencing hearing, the jury returned a sentence of death, finding sufficient evidence for two aggravating factors and no mitigating factors. *Id.* at 723.

Petitioner filed a direct appeal, and the Pennsylvania Supreme Court affirmed the conviction and sentence. *Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719 (1993). On January 14, 1997, Petitioner filed a petition for relief under the Pennsylvania Post–Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. §§ 9541–9551. The Court of Common Pleas denied all relief on November 13, 1997. The Pennsylvania Supreme Court affirmed that ruling on August 9, 1999. *Commonwealth v. Hackett*, 558 Pa. 78, 735 A.2d 688 (1999). The United States Supreme Court denied certiorari on February 22, 2000. *Hackett v. Pennsylvania*, 528 U.S. 1163, 120 S.Ct. 1178, 145 L.Ed.2d 1086 (2000).

## II. LEGAL STANDARD

In 1996, Congress passed the Anti-terrorism and Effective Death Penalty ("AEDPA"), which amended the federal habeas statute. The pertinent section of the statute provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

28 U.S.C.A. § 2254(d)(1) (West Supp.2001). To obtain federal habeas relief, a petitioner must demonstrate that his case satisfies the condition set by § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Hameen v. Delaware*, 212 F.3d 226, 235 (3d Cir.2000). AEDPA increases the deference that federal courts must give to the factual findings and legal determinations of the state courts. *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir.2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001).

■ State court's determinations may only be tested against "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1) (West Supp.2001). This phrase refers to the "holdings, as opposed to the dicta" of the Supreme Court's decisions "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. Rules of law that would qualify as old rules under the Supreme Court's jurisprudence of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) will constitute clearly established Federal law for the purposes of § 2254(d)(1), except that the source of that clearly established law is restricted to the United States Supreme Court. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495.

■ The structure for determining claims under AEDPA applies is as follows.

To apply AEDPA standards to pure questions of law or mixed questions of law and fact, federal habeas courts must first determine whether the state court decision regarding each claim was "contrary to" Supreme Court precedent. *Werts*, 228 F.3d at 197. If relevant United States Supreme Court precedent requires an outcome contrary to that reached by the state court, then the habeas court may grant habeas relief at this juncture. *Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir. 1999). Otherwise, the court must evaluate whether the state court decision was based on an "unreasonable application of" Supreme Court precedent. *Id.* at 890.

■ The "contrary to" and "unreasonable application" clauses are properly accorded independent meaning. *Williams*, 529 U.S. at 405, 120 S.Ct. 1495; *Hameen*, 212 F.3d at 235. A state court decision may be 'contrary to' clearly established federal law as determined by the United States Supreme Court in two ways. *See id.* at 405, 120 S.Ct. 1495. First, a state court decision is contrary to United States Supreme Court precedent where the court applies a rule that contradicts the governing law set forth in United States Supreme Court cases. *Id.* Alternatively, a state court decision is contrary where the court confronts facts that are materially indistinguishable from a relevant United States Supreme Court precedent and arrives at an opposite result. *Id.* at 406, 120 S.Ct. 1495; *Hameen*, 212 F.3d at 235. It is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's interpretation; rather, Petitioner must demonstrate that Supreme Court precedent requires the contrary outcome. *Werts*, 228 F.3d at 197; *Matteo*, 171 F.3d at 888.

■ On the other hand, a state court decision that applies the correct legal rule

from the United States Supreme Court precedent to the facts of a prisoner's case does not fit comfortably within the "contrary to" clause, and is more appropriately considered under the "unreasonable application" clause. *Williams,* 529 U.S. at 406, 120 S.Ct. 1495; *Hameen,* 212 F.3d at 235. A state court decision can involve an "unreasonable application" of the Supreme Court's precedent if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or if a state court decision extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply. *Williams,* 529 U.S. at 407, 120 S.Ct. 1495; *Hameen,* 212 F.3d at 235. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. *Williams,* 529 U.S. at 409, 120 S.Ct. 1495; *Hameen,* 212 F.3d at 235. Mere disagreement with the state court's conclusions is not enough to warrant habeas relief under the "unreasonable application" clause. *Matteo,* 171 F.3d at 890. In determining whether the state court's application of the Supreme Court precedent is reasonable, habeas courts may consider the decisions of inferior federal courts. *Id.* at 890.

## III. DISCUSSION

Petitioner brings six claims in this Petition.

I. Ineffective assistance of counsel for failure to preserve in post-trial motions and on direct appeal trial objections to the trial court's limits on questioning as to race in voir dire, and to the trial court's refusal to allow individual voir dire, in violation of *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (guilt phase).

II. Ineffective assistance of counsel for failure to inform his client of the fact that the trial court judge announced in chambers that he had discerned violations of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and for failure to move to strike the jurors thus assembled.

III. Ineffective assistance of counsel, for failure to preserve in post-trial motions and on direct appeal trial objections to the trial court's limits on questioning as to race in voir dire and to the trial court's refusal to allow individual voir dire, in violation of *Turner v. Murray* (sentencing phase).

IV. Error in the trial court's instructions to the jury at the penalty phase suggesting to the jurors they must be unanimous as to the existence of any mitigating circumstances and failing to inform the jury as to what it should do if some but not all of their membership found that a mitigating factor existed.

V. Ineffective assistance of counsel for failure to object to the prosecutor's penalty stage summation that urged the jury to show the same "mercy" on the defendant as the defendant showed against the victim.

VI. Ineffective assistance of counsel for failure to preserve in post-trial motions and on direct appeal his objections to the trial court's limitation of the testimony of a mitigating factor witness.

All of the claims asserted in the instant Petition were presented to and decided by the Pennsylvania State Supreme Court on direct appeal or on collateral appeal. *See Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719 (1993); *Commonwealth v. Hackett,* 558 Pa. 78, 735 A.2d 688 (1999). As such, there are no exhaustion or procedural default issues with respect to these claims.

## A. Claims of Ineffective Assistance of Counsel

■ Claims of ineffective assistance of counsel are governed by the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to obtain a reversal of a conviction on the ground that counsel was ineffective, the petitioner must establish: (1) that counsel's performance fell well below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Id.* at 687, 104 S.Ct. 2052. Counsel is presumed effective, and petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 686–89, 104 S.Ct. 2052. *Strickland* imposes a "highly demanding" standard upon a petitioner to prove the "gross incompetence" of his counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir.), *cert. denied*, 527 U.S. 1050, 119 S.Ct. 2418, 144 L.Ed.2d 815 (1999) ("Because counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing, we have cautioned that it is 'only the rare claim of ineffectiveness that should succeed under the properly defer-

ential standard to be applied in scrutinizing counsel's performance.'") Under *Strickland*, counsel cannot be ineffective for failing to raise meritless claims. *Mahony v. Vaughn*, 2001 WL 51101, at *2 (E.D.Pa. Jan. 19, 2001).

In the PCRA appeal, the Pennsylvania court denied each of Petitioner's ineffective assistance claims. The Court will consider each claim in turn.

### 1. *Turner* Claims (Claims I and III):

■ Petitioner first asserts that counsel was ineffective for failing to preserve on post-trial motion his trial objections to limitations on voir dire with respect to race. The state PCRA court denied this contention on the basis that the underlying claim was not meritorious. *Hackett*, 735 A.2d at 692. Petitioner seeks to vacate both the sentence and conviction on this ground. The Court concludes that the state's decision was not contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and therefore denies Petitioner's *Turner* claims.

Three jury panels were used to obtain the petit jury. Petitioner asserts error with respect to the voir dire of all three jury panels, but Petitioner notes that the limitation on voir dire on the issue of racial bias was the most severe with respect to the second panel.[1] The Court will first

---

1. The question posed to the first jury panel was as follows:

Now, ladies and gentlemen of the jury panel, as a result of this matter, two people were injured. One was a young white male about nineteen years of age, and the other a young white female, who died as a result of the matter, the case, as you heard me tell you. I pose this question to all of you. Is there any among you that have any feelings against any of these defendants, both the three black men and the white man, because of their race or color?

N.T. 6/21/88 at 59. There were no affirmative responses to the question. *Id.*

The question posed to the third jury panel was as follows:

Now, ladies and gentlemen of the jury panel, it is quite obvious to you that three of the defendants in this matter are members of the black race. One is a member of the white race. As I have heretofore advised you and told you, the young lady involved in this matter who died was a young white girl. The young man who was injured was a young white man. I've told you this before. I pose this question to you. Is

examine the voir dire with respect to the second jury panel, from which two jurors were derived. The trial court in its opening remarks to the second jury panel (prior to voir dire), stated that "there must be no prejudice or bias in reaching or approaching the determination of innocence or guilt of these defendants individually or collectively. Certainly, there must be no racism interjected, consciously or subconsciously, into the determination of the issues here involved...." N.T. 6/24/88 at 394–95. During voir dire, the court asked the following single question on the issue of racial bias:

> Now, ladies and gentlemen of the jury panel, you already heard from me that a young white girl died as a result of this incident alleged to have taken place, and a young white man was injured. You will note, quite obviously, that three out of the four defendants are members of the black race. I therefore pose this question to all of you. Is there any among you that have any feelings against all the defendants individually or collectively resulting, therefore, in a fixed opinion as to their guilt or innocence individually or collectively because of the race or color of any of the defendants? If so, please raise your hand.

N.T. 6/24/88 at 410. Two members of the panel responded affirmatively to the question. *Id.* The court followed up with individual voir dire, and eventually dismissed both prospective jurors for cause. N.T. 6/24/88 at 419–21, 440–44.

■■■ Voir dire on racial bias with respect to capital cases is governed by the United States Supreme Court decision in *Turner v. Murray*,[2] 476 U.S. 28, 106 S.Ct.

1683, 90 L.Ed.2d 27 (1986). *Turner* involved a black defendant convicted of murdering a white victim. During voir dire, the trial court did not disclose the race of the victim to the prospective jury panel, and did not question the panel as to racial bias. *Turner*, 476 U.S. at 33, 106 S.Ct. 1683. The Court determined that the trial court's refusal to provide such voir dire was improper, and held that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. *Id.* at 36, 106 S.Ct. 1683.

In the instant case, Petitioner's counsel objected to the voir dire limits at trial, but did not preserve the issue in post-trial motions. Petitioner claims that this failure to preserve the issue constituted ineffective assistance of counsel. With respect to the underlying claim, Petitioner contends that the trial court failed to meet the requirements of *Turner*, for two reasons. First, Petitioner contends that a "fixed opinion" is different from "bias or prejudice."[3] Pet. at 7. For this reason, Petitioner claims that the trial court's lone question as to fixed opinion failed to meet the requirement of *Turner* that the potential jurors be questioned on racial bias. *Id.* Petitioner posits that the trial court's question, by its limitation to fixed opinion, "allowed all other lesser but nonetheless virulent prejudices to remain unmasked [sic]." Pet. at 15. Second, Petitioner argues that the trial court should have questioned each member of the jury panel individually in order to elicit more frank and

---

there any among you that have any feelings whatsoever against the defendants on account of their race or color? If so, please raise your hand.

N.T. 6/28/88 at 691–92. There were no affirmative responses to the question. *Id.* at 692.

2. *Turner* was clearly established federal law at the time of trial. *See Williams*, 529 U.S. at 412, 120 S.Ct. 1495.

3. The question posed to the first and third panels does not suffer from this alleged defect.

honest responses to the racial bias inquiry. Pet. at 16.

The Pennsylvania Supreme Court denied Petitioner's challenge. The court determined that the trial court met the basic requirements of *Turner*. The court observed that, unlike the situation in *Turner*, the trial court informed the venire persons of the race of the victim, and proceeded to ask the question regarding racial prejudice. Thus, the trial court fulfilled the requirements of *Turner*. The state court went on to examine the voir dire transcript itself, and determined that, under the prevailing standards, it was not improperly limited by the trial court. *Hackett*, 735 A.2d at 692. The court thus denied the ineffectiveness claim on the basis that the underlying claim lacked merit. *Id.*

This Court cannot conclude that the Pennsylvania Supreme Court's determination that the dictates of *Turner* were met, and that the questioning, albeit limited, was sufficient as mandated by *Turner*, was contrary to or an unreasonable application of clearly established federal law. Neither *Turner* nor any other United States Supreme Court precedent identified by Petitioner or discovered by the Court requires that more specific or extensive questioning was required.[4] Neither can the Court discern any United States Supreme Court rule that mandates individual voir dire as advocated by Petitioner. Thus, the Court concludes that the Pennsylvania Supreme

Court applied the correct legal rules from the United States Supreme Court, and that the state court's decision was not contrary to United States Supreme Court precedent. Furthermore, this Court concludes that the state court's application of *Turner* was not unreasonable. Petitioner has failed to demonstrate that other courts have applied his interpretation of *Turner*, and the Court has not found similar applications of *Turner* which would suggest that the Pennsylvania Supreme Court's interpretation is objectively unreasonable. As such, this Court concludes that the state court's conclusion did not involve an unreasonable interpretation of clearly established federal law established in *Turner* or the holding of any other applicable United States Supreme Court.[5]

Petitioner further challenges the Pennsylvania Supreme Court's discussion of "abuse of discretion" in determining the scope of voir dire, and argues that the court improperly used its own decision in *Commonwealth v. Richardson*, 504 Pa. 358, 473 A.2d 1361 (1984). Specifically, the court noted that the record demonstrated "that the issue of race was neither raised at trial nor emphasized by the prosecutor.... Given these circumstances, we find that the trial court did not abuse its discretion by limiting the inquiry concerning racial prejudices to the question of whether the prospective jurors had any

---

**4.** Petitioner cites *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), a case examining more closely the extent of voir dire required in capital cases. However, the issue in *Witherspoon* was not voir dire with respect to racial bias; rather, the issue was whether the prosecutor could strike potential jurors who expressed any qualms about capital punishment. *Witherspoon* does not speak to whether the trial court in Petitioner's case improperly limited questioning by asking only one question on racial bias, and therefore does not mandate a different outcome here.

Neither do the other cases cited by Petitioner, addressing the general importance of adequate voir dire, mandate the more extensive voir dire sought by Petitioner here.

**5.** The Court further concludes that, because Petitioner is not entitled to relief with respect to alleged *Turner* error as to the second jury panel, Petitioner similarly is not entitled to relief with respect to the first and third jury panels, in which the voir dire was less limited.

feelings against the defendants as to their guilt or innocence based on their race." *Id.* at 692, 735 A.2d 688.

■ This Court lacks the power on habeas review to review state court decisions of questions of state law. *See Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); 28 U.S.C. § 2254(a) (West Supp.2001). Nevertheless, the Court understands Petitioner to be asserting that the state court applied an improper legal inquiry with respect to its application of *Turner.* Petitioner is correct that if, in determining whether there was a *Turner* violation, the state court relied on an "abuse of discretion" inquiry, then the state court's decision would have been contrary to federal law, because *Turner* stands for the proposition that an interracial capital case necessarily requires an inquiry into racial bias. However, Petitioner misreads the state court's decision. As has already been discussed above, the Pennsylvania Supreme Court applied the correct legal rule from *Turner* to ensure that its requirements were met. Upon determining that *Turner* was satisfied, the court then further examined the voir dire in the context of state law to determine if the trial judge had abused his discretion in otherwise limiting voir dire. The Court therefore cannot conclude that the Pennsylvania Supreme Court made a conclusion of law contrary to *Turner* by applying its "abuse of discretion" inquiry under state law.

As the state court noted, there can be no claim of ineffective assistance of counsel for failing to preserve on appeal an issue that was meritless. *Hackett,* 735 A.2d at 692. However, the Court notes that even if Petitioner's underlying claim were meritorious, Petitioner's ineffectiveness claim

would still fail under *Strickland.* In this case, the Court cannot conclude, given the absence of clear legal precedents supporting Petitioner's position, that trial counsel's performance fell well below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Failure to meet this prong of *Strickland* would by itself warrant denial of the claim. *See id.*

The Court concludes that the state court's determination was not contrary to or an unreasonable application of Supreme Court precedent, and therefore concludes that Petitioner's ineffective assistance claim must fail. Thus, the Court denies Petitioner's ineffective assistance claims under *Turner* with respect to both the guilt and sentencing phases.

### 2. *Batson* Claim (Claim II)

■ Petitioner next seeks to vacate his conviction on the ground that trial counsel was ineffective because he failed to inform his client that, in chambers, the trial judge had announced he had found *Batson* violations and trial counsel failed to move to strike the jurors at that time. The Court denies Petitioner's claim.

■ The Equal Protection clause prohibits a prosecutor from exercising peremptory challenges to exclude otherwise qualified persons from a jury solely on account of their race. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To establish a prima facie case of a violation under *Batson,* the defendant must show that he or she is a member of a cognizable racial group and the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.[6] *Batson,* 476 U.S. at 96,

---

**6.** The Supreme Court has subsequently extended *Batson* such that a defendant, regardless of his race, may now assert a *Batson* violation for exercise of peremptory challenges in such fashion. *Powers v. Ohio,* 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

106 S.Ct. 1712. The defendant also must show that the facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. *Id.* Additionally, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Id.* Once the defendant makes a prima facie showing, the burden shifts to the State to present a neutral explanation for challenging the relevant jurors. *Id.* at 97, 106 S.Ct. 1712. The explanation need not rise to the level justifying exercise of a challenge for cause. *Id.*

Petitioner's claim stems from the following statement made by the trial court judge:

I make no further comment than what I'm going to say. Mr. Floyd [counsel for Defendant Spence] has already at least three times raised the question of Batson. I am now advising everyone, I think both sides have been involved in Batson violations. I will allow it but once more and I will not thereafter permit it. I will do what I feel I must do under the circumstances. I'm advising everyone so that no one gets the feeling that I'm going to surprise them. I strongly urge you to be just a little bit more considerate and view whether a

person is qualified not by outside influences. You may do as you please.

N.T. 6/23/88 at 317. Through the course of voir dire, trial counsel made a number of objections on the basis of *Batson*, though on none of these occasions did the trial judge determine that a prima facie case of a *Batson* violation had occurred.[7] *See, e.g.,* N.T. 6/22/88 at 193; N.T. 6/22/88 at 280; N.T. 6/27/88 at 653; N.T. 6/27/88 at 660. The judge's comment immediately followed the exercise of a peremptory challenge by Petitioner's counsel. N.T. 6/23/88 at 316. The judge's comment was not prompted by objections by counsel. N.T. 6/23/88 at 317. There was no objection made by anyone at that point. Petitioner claims that his trial counsel was ineffective for failing to disclose the fact that the judge had made this statement to him,[8] and for failing to move to strike the assembled jurors.

The Pennsylvania Supreme Court rejected the claimed ineffective assistance of counsel. The court refused to recognize the trial judge's statement as a finding that a prima facie case of a *Batson* violation had occurred. *Hackett,* 735 A.2d at 694–95. The court noted that the statement made by the trial judge was not sufficient to establish a prima facie case of improper use of peremptory strikes. *Id.* It observed: "Given this context to the trial court's statement, Appellant cannot

---

7. Once during jury selection, the trial judge asked the Assistant District Attorney to explain why he struck a particular prospective juror, in the absence of an objection by defense counsel, and without making a finding that a prima facie violation of *Batson* had occurred. The ADA initially refused to provide such an explanation on the basis that no *Batson* violation had occurred. He then provided the explanation to the court's satisfaction. N.T. 6/23/88 at 356–61.

8. Petitioner claims, "Trial Counsel did not object to proceeding with the jury as described by the Court. Nor did he inform his

client (who had a constitutional right to participate in jury selection) that the Court had discerned *Batson* violations in the jury selection process. Additionally, counsel had the obligation to inform his client of the fact that the Court intended to allow still another *Batson* violation...." Pet. at 40. The transcript, however, does not indicate that the statement was made outside of Petitioner's presence, either in chambers or at side bar, unless Petitioner was not in the courtroom at all. N.T. 6/23/88 at 315–17. In any case, this aspect of Petitioner's claim fails for the same reasons that the other aspects of his ineffective assistance claim fail.

rely on such statement alone to establish the existence of a cognizable *Batson* claim." *Id.* The court further observed that Petitioner otherwise failed to make the requisite record regarding the existence of a *Batson* claim. *Id.* As a result, the underlying claim lacked merit, and counsel could not be regarded as ineffective for failing to raise a meritless claim. *Id.*

■ There is no set formula or set list of factors that are used to determine whether a prima facie case of a *Batson* violation exists. *See Batson*, 476 U.S. at 96, 106 S.Ct. 1712. Rather, the trial court's determination of whether a *Batson* violation exists is made by considering all of the relevant circumstances, including, for example, existence of a pattern of strikes against jurors of a particular race, or evidence based on the prosecutor's questions. *Id.* The Court of Appeals for the Third Circuit has articulated a non-exhaustive five-factor test to determine whether the defendant has presented a prima facie *Batson* case: (1) how many members of the cognizable racial group were in the venire; (2) the nature of the crime; (3) the race of the defendant and the victim; (4) the pattern of strikes; and (5) the prosecutor's statements and questions. *Deputy v. Taylor*, 19 F.3d 1485, 1492 (1994).

Because there is no set formula or requisite number of findings necessary to conclude that a prima facie *Batson* violation occurred, this Court recognizes that a statement by the trial court to that effect could be sufficient to act as a determination that a prima facie violation had occurred, even in the absence of other evidence in the record establishing that a prima facie violation had occurred. The wording of this particular statement, on its face, could reasonably be interpreted as an indication that the trial judge determined that prima facie *Batson* violations had oc-

curred. Nevertheless, considering all of the accompanying circumstances and the context in which the statement was made, this Court cannot conclude that the state court's determination that the statement did not constitute such a finding under *Batson* was objectively unreasonable. The comment was, at that point in voir dire, entirely unsolicited. It was neither preceded nor followed by unusual questioning, objections, or even comments by the prosecutor or any counsel. The trial judge made the comment following the exercise of a peremptory challenge by Petitioner's counsel. N.T. 6/23/88 at 316.

Aside from the trial judge's comment, Petitioner has not raised, and the record lacks, any other basis for establishing such prima facie violations had occurred, either with this specific potential juror or with prior potential jurors. On prior occasions when defense counsel had in fact made *Batson* objections, the trial judge overruled those objections and declined to ask the prosecutor to provide race-neutral explanations for dismissal. *See* N.T. 6/22/88 at 193–94, 280; N.T. 6/27/88 at 653, 660. Furthermore, examining the remainder of the voir dire record, the Court notes an absence of the preservation of such prima facie violations. This being the case, the motion to strike the jury panel thus assembled would have been meritless, and as such, trial counsel could not be ineffective for failing to raise it. *Accord Muhammad v. Sublett*, 2000 WL 1028963, at *1, 232 F.3d 895 (9th Cir.2000). Thus, the Court concludes that the state court's decision was neither contrary to nor an unreasonable application of *Batson*.

■ Furthermore, even if the trial judge's comment did constitute a finding of a prima facie case of a *Batson* violation, the Court concludes that Petitioner's claim would still fail under the rubric of the ineffective assistance of counsel inquiry under which the claim is raised. In order

to succeed on an ineffectiveness claim, a Petitioner must overcome a highly demanding standard to prove gross incompetence of counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Petitioner must establish both that counsel's performance fell well below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant. *Id.* When applying *Strickland*, a Court is free to dispose of an ineffective assistance claim on either of its two grounds. *Id.* Here, the claim would fail on one, if not both prongs. For purposes of *Strickland*, prejudice exists only if there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. Thus, here, Petitioner would need to demonstrate that in the absence of the error, he would have been acquitted. However, at trial, the prosecution presented overwhelming evidence of Petitioner's guilt, and this Court concludes that Petitioner cannot show there would have been a reasonable probability that he would have been acquitted.[9] *See Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719. Thus, Petitioner cannot meet the prejudice prong of *Strickland*. *See Reed v. Norris*, 195 F.3d 1004, 1006 (8th Cir.1999) (denying habeas petition on basis that overwhelming evidence of guilt at trial rendered petitioner unable to demonstrate prejudice under *Strickland*). For that reason, his claim fails under *Strickland*.

In light of the above reasons, the Court denies Petitioner's petition to vacate his conviction and for new trial.

### 3. Prosecutorial Misconduct Claim (Claim V)

■ Petitioner next claims that counsel was ineffective for failing to object during

the prosecution's penalty stage summation to a comment asking the jury to "show the same mercy" on Petitioner as he showed to his victims. The Court denies this claim.

In his sentencing summation, the Prosecutor commented as follows:

> Maureen Dunne on July thirty-first, 1986 was snug in her bed, when these guys came into the house and brutally, cowardly, attacked her. Think about that moment. And think about when they've asked you to be merciful. Think of the mercy that was given to Maureen Dunne and Gregory Ogrod. But think about the bruises on Maureen's arms as she was crying out for mercy to stop this beating to her, as she was crying to stop it and it was continued. Think about that when you want to think about mercy and sympathy for these guys. You think about her last moments on earth, and you think about sympathy and mercy. *Show them the same mercy they showed Maureen Dunne.*

N.T. 7/16/88 at 1805 (emphasis added).

Petitioner submits that trial counsel was ineffective for failing to object to the prosecutor's summation. Pet. at 25. Petitioner contends that the prosecutor's comment constituted prosecutorial misconduct because the comments appealed to base emotions and was the kind of "plea that could well have been made to a lynch mob." Pet. at 24–25. Furthermore, Petitioner, relying on the United States Court of Appeals for the Third Circuit's decision in *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), claims that the comment constitutes reversible error. Pet. at 25.

The Pennsylvania Supreme Court rejected Petitioner's claim, and held that the summation was proper. The court ob-

---

9. The state court opinion gives a sufficient recitation of the evidence, much of it uncontroverted, presented against Petitioner at trial, with respect to the particular aspects of his crime.

served that a prosecutor's comments constitute reversible error if "their unavoidable effect would be to prejudice the jury and form in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination." *Hackett*, 735 A.2d at 696. The court ultimately concluded that the prosecutor's statements did not constitute reversible error. *Id.*

 In order to overturn a conviction or sentence for improper prosecutorial comments during a summation, the defendant must demonstrate prejudice sufficient to show the comments deprived defendant of a fair trial or violated the reliability of the sentencing process. *Darden v. Wainwright*, 477 U.S. 168, 180–81, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (upholding death sentence despite the prosecutor's improper comments because of lack of prejudice). The court views the statements, in the context of the entire proceeding, to determine if they "so infected the trial with unfairness as to make the resulting verdict a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (upholding conviction despite improper remarks by the prosecutor as to the defen-

dant's motivation to stand trial rather than plead)). Absent such a showing of unfairness and prejudice, prosecutorial misconduct alone does not require invalidation of a conviction or sentence. *See Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

Even assuming that the statement in isolation was improper, this Court concludes that the state court's conclusion regarding the merits of the underlying claim was objectively reasonable. Examining the entire sentencing proceeding and the entire closing argument, the prosecutor's statement did not "so infect" the proceeding with unfairness as to make it unreliable. The comment was a single reference made in direct response to particular comments made by defense counsel in his closing.[10] The prosecutor made no other such appeals either during his summation or at any other point in addressing the jury or during the course of the trial. Neither does the Third Circuit's decision in *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.1991), the case cited by Petitioner, change the outcome. *Lesko* is distinguishable because it involved a Fifth Amendment violation in addition to a "sympathy" statement.[11] The *Lesko* court's determination that the prosecutor's comments were not harmless error was based on the cumulative effect of the comments. *Id.* at 1541. Based on the

---

**10.** Trial counsel remarked in his penalty phase summation:

> Because in fixing the penalty at death, what we are saying is that that's what we want.... And if that is your decision, sometime down the road, a year or two or whatever, on some quiet night in the middle of the winter, perhaps, when you and Mr. McMahon and I are snug somewhere in our beds or snugged somewhere far away from this courtroom, these young men will be taken from their prison cell and strapped into a chair and fried.
>
> N.T. 7/16/88 at 1778.

**11.** The prosecutor said the following about the defendant's mitigating circumstances evidence:

> Good character and record. All of the character witnesses limited their testimony to a certain period of time ... We heard about John Lesko up to a certain point. And I want you to consider that. John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.
>
> *Lesko*, 925 F.2d at 1540.

above, the Court concludes that the Pennsylvania Supreme Court's conclusions were neither contrary to nor involved an unreasonable application of clearly established federal law as established by the United States Supreme Court in *Darden, Greer, Donnelly,* and *Smith.*

Furthermore, this claim arises under ineffective assistance of counsel, and reversal of the sentence would not be warranted under the *Strickland* framework. *Strickland* imposes a "highly demanding" standard upon a petitioner to prove the "gross incompetence" of his counsel. *Kimmelman,* 477 U.S. at 382, 106 S.Ct. 2574. Only the rare ineffectiveness claim succeeds under what is a highly deferential standard. *See Buehl v. Vaughn,* 166 F.3d 163, 169 (3d Cir.1999). Here, given the state of the law at the time of trial, it is not clear that the summation statement was improper, let alone that it constituted reversible error. This Court would not be able to conclude that defense counsel's failure to object fell to the level of gross incompetence.

For these reasons, the Court denies Petitioner's claim on this ground.

#### 4. Mitigating Evidence Claim (Claim VI)

██ Petitioner asserts that trial counsel was ineffective for failing to preserve on post-trial motion the limitations on the testimony of Dr. Albert Levitt, a psychologist, as to mitigating circumstances. Petitioner seeks to vacate his sentence. The Court denies Petitioner's claim on this ground.

Dr. Levitt testified that the Petitioner's "maturity age" was of a child between eight and ten years of age. N.T. 7/15/88 at 1664. Dr. Levitt testified regarding various tests he had done, including one in which the subject is asked to draw a house, a tree, and a person. *Id.* at 1656–64. From these drawings, the psychologist is able to make various conclusions about the individual's psychological maturity. *Id.*

On cross-examination, the following exchange took place:

McMahon: It couldn't be that he was just a bad drawer?

Witness: No, sir.

McMahon: And do you mean to tell these ladies and gentlemen of the jury that in asking him to draw a tree, that because he put it on a hill, that indicates depression? One man draws one tree on a hill, and you're going to state an opinion that that means depression?

Witness: Yes, That's what I'm going to say. And that's what the literature—

McMahon: And you are going to tell these people—

Witness: And that's what the literature says.

COURT: Let him answer. You've asked the question sir, let him answer.

McMahon: Yes, I will, Your Honor.

COURT: Go ahead Mr. Levitt.

McMahon: You're going to tell these people—

COURT: No, he hasn't answered the question yet.

Witness: There is a great body of literature on these drawings. There are many experts.

COURT: Sir, don't tell us about experts. You're being asked about what your conclusions are.

Witness: What I'm saying is there are people who do studies on these drawings.

COURT: Sir, you won't listen to me, will you?

Witness: I'm sorry.

COURT: You're being asked about your conclusion, not whether any experts—

Bergstrom: Objection. He's telling the Court what the basis of his opinion is.

COURT: Sir, your objection is noted and overruled. Sir, what you have are your conclusions. That's all I understand that the District Attorney is asking you.

Witness: That that indicates depression.

COURT: All right.

N.T. 7/15/88 at 1685–87.

Petitioner asserts that counsel was ineffective for failing to preserve, on post-trial motions, those objections he made to the purported limitations placed by the trial court on Dr. Levitt's testimony. Petitioner claims that, by refusing to permit Dr. Levitt to give the basis of his opinion, the trial court impermissibly limited the jury's consideration of mitigating circumstances, thus violating the rule in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which mandates that consideration of mitigating evidence not be limited. Petitioner claims that the limitations placed on Dr. Levitt's testimony kept from the jury explanations relating to his conclusions regarding Petitioner's maturity and mental state.

 In *Lockett*, the Court recognized that "the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country." *Lockett*, 438 U.S. at 602, 98 S.Ct. 2954. The Court held that the Eighth and Fourteenth Amendments require that "the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. 2954. It does not matter whether this limitation

is the result of the statute, *Lockett*, 438 U.S. at 604, 98 S.Ct. 2954, the sentencing court, *Eddings v. Oklahoma*, 455 U.S. 104, 113, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), evidentiary ruling, *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), or an erroneous interpretation of instructions by a sentencing jury. *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

The Pennsylvania Supreme Court rejected Petitioner's claim on the basis that the underlying claim lacked merit. *Hackett*, 735 A.2d at 696. The reviewing court examined the record, and determined that, contrary to Petitioner's claim, the trial court did not preclude the witness from offering evidence relating to the basis for his expert opinion. *Id.*

This Court concludes that the Pennsylvania Supreme Court's conclusion was neither contrary to nor an unreasonable application of clearly established federal law in established in *Lockett*. In order to establish a violation of the rule in *Lockett*, Petitioner must establish that there were improper limitations on the presentation of the mitigating evidence. *See Lockett*, 438 U.S. at 605, 98 S.Ct. 2954; *accord Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir.1997) (finding no prejudice where petitioner claimed counsel failed to present more effective mitigating evidence, but failed to show what the additional evidence would have been). Petitioner has failed to explain what additional mitigating information Dr. Levitt would have provided had the trial court not overruled trial counsel's objection.

Even assuming that the trial court erred in overruling trial counsel's objection,[12] the transcript reveals that Dr. Levitt had already testified extensively regarding the

**12.** The Court deems it is unnecessary to decide the issue of whether or not the trial court erred by overruling the objection.

basis for his professional opinions. Prior to Dr. Levitt's testimony, Petitioner's counsel informed the court that there was a stipulation that the witness "is a qualified psychologist and capable of testifying as an expert in the field of psychology." N.T. 7/15/88 at 1655. The court instructed the jury as follows:

Ladies and gentlemen of the jury, I'm sure you will recall that I did in my charge the other day explain to you what is meant by an expert witness. They are permitted to, upon proof that they have the background and so on, they're permitted to give opinions and draw conclusions. The ordinary witness is not.

Counsel for the defense, for the defendant, and the District Attorney have agreed that Mr. Levitt has the necessary qualifications as a psychologist to be able to express opinions and to draw conclusions ordinarily most of us couldn't do.

N.T. 7/15/88 at 1655–56. During direct examination, Dr. Levitt specifically described the test, how it was administered, how it was used in diagnosis, and how it applied to Petitioner. The jury was given copies of the five drawings made by Mr. Hackett. Dr. Levitt testified that:

Well, that, is a projective test, again, and we find a number of problems that come out in that testing. We see how he perceives things, how he can reconstruct common items, and whether he has any emotional problems. For example, when he draws a house, we can sometimes see whether he's blocking feelings about the house, whether he's showing the house to be a warm place, whether he's in this case drawing the house that looks like a face. He draws

two windows, a door and it looks like a little mustache on it.

\*　　\*　　\*　　\*　　\*　　\*

The testing also shows very regressed, immature perception of reality situations, which is a sign of immaturity and possibly illness.

N.T. 7/15/88 at 1658–59.

Examining Dr. Levitt's testimony, this Court concludes that the Pennsylvania Supreme Court's conclusion is not contrary to *Lockett.* Furthermore, the Court concludes that the state court's decision was not objectively unreasonable, and therefore did not involve an unreasonable application of clearly established federal law. As trial counsel here cannot be deemed ineffective for failing to preserve the issue on post-trial motions,[13] the Court denies Petitioner's claim.

### B. *Mills* Claim (Claim IV)

Petitioner next challenges the trial court's jury instructions and verdict sheet. Petitioner asserts that they were unconstitutional because they may have led the jury to believe it was precluded from considering certain mitigating evidence. Specifically, Petitioner asserts that there was a reasonable likelihood that the instructions and verdict sheet led the jury to believe it had to unanimously agree to the existence of mitigating circumstances in order to consider such circumstances. Pet. at 21–23. Petitioner's claim is based on the rule articulated in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in which the United States Supreme Court invalidated a sentence of death on the ground there was a substantial probability that jurors thought they were precluded from considering any

---

**13.** This claim arises in the context of ineffective assistance of counsel. However, because the Court concludes that the underlying claim is not meritorious, the Court need not address the claim in the context of the two-prong *Strickland* inquiry.

mitigating evidence unless they unanimously agreed on the existence of particular circumstances. *Mills,* 486 U.S. at 381, 108 S.Ct. 1860 ("Our reading is at least a substantial risk that the jury was misinformed.") For the reasons that follow, the Court determines that the state court's failure to apply the legal standard from *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), in adjudicating Petitioner's *Mills* claim was contrary to clearly established federal law as determined by the Supreme Court of the United States. The Court further concludes on plenary review that the instructions and verdict form created a reasonable likelihood that the jury understood the instructions in such a way that it was improperly prevented from considering mitigating evidence.

### 1. The Trial Instructions and Verdict Sheet

The trial court instructed the jury as follows:

The sentence will depend upon your findings concerning aggravating or mitigating circumstances. The Crimes Code provides that a verdict must be the sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstance [sic] which outweigh any mitigating circumstances that you may determine. The verdict must be a sentence of life imprisonment in all other cases.

The Crimes Code defines aggravating and mitigating circumstances. For the purposes confronting you at this time in this case, only the following matters, if proven, can constitute aggravating circumstances.

Now, ladies and gentlemen, I digress for a moment. Some of these may have no application, but I'm going to give them all to you. You will then have to make a determination as to whether, in your view, they apply or not.

[listing possible aggravating circumstances.]

I am a bit repetitious. You may note, some of those don't have any application to this matter, but I'm giving them all to you. It is your determination to find as you must or not, as you see it, whether any of the things I've just read constitute aggravating circumstances, as it applies to this case and these defendants.

For the purpose or purposes of this case, the following matters, if proven, can constitute mitigating circumstances: [listing possible mitigating circumstances]

Next. The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. As you will recall, I defined that term for you. The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side.

All the evidence from both sides, including the evidence you heard earlier during the trial in chief, as to aggravating or mitigating circumstances is important and proper for you to consider. You should not decide out of any feelings of vengeance or prejudice toward the defendants acting as I've heretofore said.

\*　　\*　　\*　　\*　　\*　　\*

Now, the verdict is for you, ladies and gentlemen of the jury. Remember and consider all of the evidence, giving it the weight to which you determine it to be entitled, remembering that you are not merely recommending a punishment. The verdict you return will actually fix

the punishment at death or life imprisonment.

Remember again that your verdict must be unanimous. All twelve of you must agree. Please note, it therefore cannot be reached by a majority vote or by a percentage. It must be the verdict of each and every one of you.

Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment.

You will be given a verdict slip, which you will refer to, ... upon which to record your verdict and findings. You will follow the directions on the verdict slip and do whatever is required.[14]

Ladies and gentlemen, finally, after conscientious and thorough deliberation, if you are unable to agree on your findings and verdict, you should report to me. If in my opinion further deliberations will not result in a unanimous agreement on the sentence, whichever it may be, it will be my duty to then impose a sentence upon the defendants ... of life imprisonment.

N.T. 7/16/88 at 1806–13.

The top of the three-page verdict sheet given to the jurors read as follows:

We, the jury, enpaneled [sic] in the above entitled case, having heretofore determined that the defendant, is guilty of murder of the first degree, do hereby find:

Verdict Sheet at 1. Following this initial statement was the heading "AGGRAVATING CIRCUMSTANCE(S)," followed by

a list of the twelve possible aggravating circumstances. Next to each circumstance was a check-off box for the jury foreperson to indicate those aggravating circumstances found by the jury. On the completed verdict sheet, two boxes were checked: "2. The defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim"; and "7. In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." Verdict Sheet at 1.

The next section of the form was demarcated by the heading "MITIGATING CIRCUMSTANCE(S)." Following this was a list of seven possible mitigating circumstances, each followed by the same check-off box to indicate each mitigating circumstance found by the jury. An eighth "catch-all" mitigating selection provided space to identify "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." Verdict Sheet at 3. Aside from the space following this catch-all, there was no space under any of the other mitigating circumstances for the jury to indicate whether a circumstance was found unanimously or only by some of the jurors. On the completed verdict sheet, no mitigating circumstances were checked off. Verdict Sheet at 2–3.

Following these lists, the verdict sheet read as follows:

We the jury, have found unanimously:

[☑] at least one aggravating circumstance and no mitigating circum-

---

**14.** Defense counsel for Co–Defendant Gray objected to the instruction, and requested the court instruct the jury, "each individual's mitigating circumstances stand on their own two feet." The trial court judge overruled the objection, reasoning, "That was covered at least seven times, I thought." N.T. 7/16/88 at 1813–14.

stance. The aggravating circumstance(s)(is)(are) *# 2 and # 7.*

[ ] one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s)(is)(are)

_____.

We, the jury, unanimously render the following sentencing verdict:

DEATH (☑)

LIFE IMPRISONMENT ( )

Verdict Sheet at 3. The completed sheet indicated the jury found "at least one aggravating circumstance and no mitigating circumstance," and rendered the sentence of death. *Id.*

### 2. AEDPA Review

█ The Eighth Amendment to the United States Constitution requires that, in a death penalty case, the sentencer be permitted to consider all relevant mitigating evidence. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). A death sentence should be vacated if there is an unacceptable likelihood that reasonable jurors, upon receiving the judge's instructions and attempting to complete the verdict form based on those instructions, thought that they could only consider those mitigating factors which were unanimously found to exist. *Mills,* 486 U.S. at 376, 108 S.Ct. 1860; *see also McKoy v. North Carolina,* 494 U.S. 433, 444, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) ("We conclude that North Carolina's unanimity requirement impermissibly limits jurors' consideration of mitigating evidence and hence is contrary to our decision in Mills."). The reason for this is that, if the jury believes it can only consider mitigating factors agreed upon unanimously, then individual jurors could be prevented from considering those factors that were not agreed to unanimously. *Id.*

The United States Supreme Court established the jury instruction rule in *Mills*

*v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In *Mills,* the Court vacated the prisoner's death sentence because it concluded there was a substantial probability that the jury instructions and verdict sheet led the jury to believe they were precluded from properly weighing mitigating evidence. *Id.* at 374, 108 S.Ct. 1860. The petitioner in *Mills* argued that the court's instructions and verdict form required the imposition of the death sentence if the jury unanimously found an aggravating circumstance but could not agree unanimously as to the existence of any particular mitigating circumstances. *Id.* at 371, 108 S.Ct. 1860. The Maryland Court of Appeals disagreed with petitioner's construction of the statute, and instead held that the requirement of unanimity applied to the jury determinations of all critical issues, including the acceptance *or rejection* of mitigating circumstances. *Id.* The U.S. Supreme Court nevertheless observed that, "While conceding that the Court of Appeals' construction of the jury instructions and verdict form is plausible, we cannot conclude, with any degree of certainty, that the jury did not adopt petitioner's interpretation of the jury instructions and verdict form...." *Id.* at 377–78, 108 S.Ct. 1860. The Court held that the instructions and verdict form were unconstitutional because they created a substantial risk that reasonable jurors might have construed the instructions such that they were precluded from considering the mitigating evidence. *Id.* at 375–76, 108 S.Ct. 1860.

Two years later, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the United States Supreme Court modified the legal standard of analysis for examining claims involving purportedly erroneous jury instructions. The *Boyde* standard is the appropriate standard to apply to determine if there are *Mills*-type violations. *See Boyde,* 494 U.S.

at 380, 110 S.Ct. 1190; *Roach v. Angelone,* 176 F.3d 210, 222 (4th Cir.1999); *Frey v. Fulcomer,* 132 F.3d 916, 921 (3d Cir.1997); *Waters v. Thomas,* 46 F.3d 1506, 1524 (11th Cir.1995). Under *Boyde,* the reviewing court must examine the case to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190. "Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition." *Id.* In assessing the effect of a challenged jury instruction, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." [15] *Id.* at 378, 110 S.Ct. 1190 (citing *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926)).

In *Boyde,* the Court sought to clarify what it observed had been an unclear legal standard. *Boyde,* 494 U.S. at 378, 110 S.Ct. 1190 ("[I]n *Mills v. Maryland,* [for example] . . . we alluded to at least three different inquiries for evaluating such a challenge: whether reasonable jurors could have drawn an impermissible interpretation from the trial court's instructions; whether there is a substantial possibility that the jury may have rested its verdict on the improper ground, and how reasonable jurors would have applied and understood the instructions . . .") (citations omitted). Unlike the "substantial proba-

bility" standard of *Mills,* the *Boyde* standard focuses on the reasonable likelihood that the entire jury applied the instruction in an improper manner. *Frey,* 132 F.3d at 921 (citing *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190). Thus, in reviewing Petitioner's claimed violation of the Eighth Amendment and *Mills,* the Court must look to *Boyde* to determine whether there was a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.[16] *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190.

The Pennsylvania Supreme Court rejected Petitioner's claim on direct appeal. The court observed:

> *Mills* concerned a Maryland statute which required jurors unanimously to agree on each individual mitigating circumstance after deciding aggravating factors. Absent unanimous agreement, the Maryland statute barred consideration of the mitigating evidence as to a given circumstance. The Pennsylvania statute, . . . does the opposite and, therefore, does not violate the rule in *Mills.* . . . The Pennsylvania statute, . . . requires that the jury unanimously agree that *no* mitigating circumstances exist and unanimously agree on a verdict for a sentence of death. Thus, while a single Pennsylvania juror can always *prevent* a death sentence, a single juror can never *compel* one, as could a single juror under the former Maryland statute. Jury instructions in the penalty phase which follow the language of the death penalty statute do not recreate the error in *Mills.* [citing prior cases upholding the same instructions.]

---

**15.** Along similar lines, the *Mills* court noted that, since there is no extrinsic evidence of what the jury actually thought, the court is left with only the verdict form and the judge's instructions in making its determination. *Id.* at 381, 108 S.Ct. 1860.

**16.** *Boyde* was decided in 1990 three years prior to the Pennsylvania Supreme Court's adjudication of Petitioner's direct appeal, and was therefore clearly established federal law at the time the state court denied the *Mills* claim. *See Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

*Hackett,* 627 A.2d at 725 (emphasis in original).

The state court failed to cite, apply, or otherwise refer to the *Boyde* standard. Rather, the court articulated two reasons for its denial. First, it distinguished the case factually from *Mills* and concluded that the Pennsylvania statute thus did not violate *Mills.* Next, the state court cited to and relied upon the holdings of prior cases in which it had considered the same instruction.[17] The state court did not refer to the verdict form or to any of the other instructions given by the trial judge. For the reasons that follow, this Court concludes that the state court failed to apply the proper legal standard articulated in *Boyde,* and therefore the state court's decision was contrary to the clearly established law determined by the United States Supreme Court in that decision.

The state court's first articulated reason for its denial of the *Mills* claim misconstrues the court's task in examining for *Mills* error by focusing on the meaning of the statute rather than on the issue of jury confusion. As *Mills* instructs, it is the danger of jury misinterpretation of the statutory scheme, rather than the existence of a constitutional interpretation of the statute by the courts, that creates the *Mills* problem. *See Mills,* 486 U.S. at 375, 108 S.Ct. 1860. Thus, while the state court was correct that the Maryland and Pennsylvania death penalty statutes differed with respect to the requirement of unanimity, the difference would *only be* relevant with respect to its effect on the likelihood that a jury would construe its task in a way that violated the Eighth Amendment. Providing a constitutional explanation of the Pennsylvania statute does not establish whether the jury instructions and verdict form created an unacceptable risk of jury confusion. *See id.* In *Mills,* for example, the Supreme Court noted that the Maryland statute in question had been interpreted constitutionally by the state court, but nonetheless vacated the Maryland court's decision because there was a substantial risk that the jury did not understand it could only impose a sentence of death if they agreed unanimously that no mitigating circumstance existed.[18] *Id.* at 371, 375, 108 S.Ct. 1860

---

17. Notwithstanding the state court's summary disposition of the claim, the Court cannot conclude that the state court failed to adjudicate the claim on its merits, which would automatically take the case outside of AEDPA's deferential standard under section 2254(d)(1). *See Hameen,* 212 F.3d at 248 ("[U]nder the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only with respect to any claim that was adjudicated on the merits in State court proceedings. Hence we exercise pre-AEDPA independent judgment on ... [this] ... claim.") (citations omitted). A state court decision that is summary and fails to state the reasons for dismissal is no less an "adjudication" of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1). *Bell v. Jarvis,* 236 F.3d 149, 158 (4th Cir.2000) (citing *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir.1998)). In this case, the state court did not err by failing to consider the claim as one falling under *Mills;* rather, the state court failed to apply the proper legal standard and conduct the proper inquiry as mandated by the United States Supreme Court.

18. The Maryland statute explicitly required unanimity for the acceptance *or rejection* of a mitigating factor for purposes of weighing those factors against aggravating circumstances. Thus, if there was a lack of unanimity as to either the acceptance or rejection of the factors, the statute mandated the imposition of life imprisonment. *Mills,* 486 U.S. at 372, 108 S.Ct. 1860. Petitioner contended that, because of the language of the instruction and the structure of the verdict form, the jury would understand that if it found an aggravating circumstance but could not agree unanimously as to a mitigating circumstance (even if one or more of the jurors believed a mitigating circumstance to exist), then the jury would have to impose a sentence of death. *Id.* at 371, 108 S.Ct. 1860. The Court

(citing *Mills*, 310 Md. 33, 527 A.2d 3, 13 (1987) ("[I]f petitioner is correct, a jury that does not unanimously agree on the existence of any mitigating circumstance may not give mitigating evidence any effect whatsoever, and must impose the sentence of death.")) Thus, in *Mills* it was the lack of clarity with respect to the necessity to reject mitigating factors unanimously, combined with the explicit requirement to find mitigating factors unanimously, that violated the Eighth Amendment.[19]

Relying on a string citation to prior cases, the state court then observed that the jury instructions following the statute did not "recreate the error in Mills." *Hackett*, 627 A.2d at 725. Because the state court relied solely upon these prior cases, this Court necessarily must examine these prior decisions in order to ascertain the state court's actual reasons for denying the *Mills* claim in this case, and to determine what legal standard the state court used. An examination of these prior decisions reveals that none contains a clear legal analysis under the *Mills* rubric of jury confusion, and more important, none applies or cites to the *Boyde* standard. *See Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 585 (1991) ("In *Mills v. Maryland*, the U.S. Supreme Court held that a Maryland death penalty statute was unconstitutional because the trial court's instructions in conjunction with the verdict form required a jury to find mitigating circumstances pursuant only to a unanimous vote. . . . The verdict slip and instructions in this case do not present the same problem of precluding an individual

juror from considering and weighing mitigating circumstances."); *Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75, 82 (1990) ("*Mills* . . . held that a Maryland death penalty statute was unconstitutional because it required a jury to find mitigating circumstances pursuant only to a unanimous vote. However, our statute does not require unanimity in establishing mitigating circumstances. The trial court's instructions in the instant case were completely consistent with the statute and our decision in *Commonwealth v. Frey* . . ."); *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, 1035–36 (1989) ("The unanimity instructions in Maryland created the unacceptable risk that individual jurors might have believed that, unless all unanimously agreed as to the existence of a particular mitigating circumstance, none of the jurors could consider such circumstance in his or her decision as to whether death was the appropriate penalty. Pennsylvania's sentencing scheme and jury instructions do not present this same problem and do not preclude an individual juror from considering and weighing any mitigating circumstance in his or her deliberations.").

The seminal state court decision relied upon in denying the *Mills* claim is *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989). In *Frey*, the state court examined and upheld the same particular jury instruction at issue in *Hackett*. *Id.* at 31. The *Frey* court distinguished *Mills* by observing, "The *Mills* decision is simply inapposite to the present case, however, for the jury instructions and verdict slip used in appellant's trial did not contain lan-

found that notwithstanding the Maryland's court's constitutional interpretation of the statute, there was a substantial risk that from the instructions and verdict form the jury would adopt Petitioner's interpretation, and thus be prevented from considering certain mitigating evidence. *Id.* at 381, 108 S.Ct. 1860.

**19.** Furthermore, the state court's observation that the Pennsylvania statute requires that the jury unanimously agree that "no mitigating circumstances exist" relies on the assumption that the jury properly interpreted the jury instructions as to require such unanimity in rejecting all mitigating factors.

guage similar to that found in *Mills*." *Id.* at 31. The state court observed:

> The present instructions did not express a need for unanimity in determining the existence of mitigating circumstances. Nor did the form of the verdict slip infer a need for such unanimity. *The jury instructions and verdict slip closely followed language in the sentencing statute stating that a unanimous verdict is necessary as to the ultimate decision to impose a sentence of death, but did not state or infer a requirement that any given mitigating circumstance must be unanimously recognized before it can be weighed against aggravating circumstances in reaching a verdict.* Thus, individual jurors were free to weigh whatever mitigating circumstances they perceived, regardless of whether other jurors agreed that those circumstances were established by the evidence. The perceptions of even one juror, alone, would be sufficient to deny the unanimity required for a sentence of death.

*Id.* at 31 (emphasis added).

*Frey*, decided in 1989, clearly did not employ the new standard articulated in *Boyde*, as *Boyde* was not rendered until a year later. The state court's wholesale adoption of *Frey* makes it clear that the state court in the instant case similarly did not employ the *Boyde* standard. The state court's additional discussion aside from its citation to *Frey* and its progeny makes no reference to the modified standard, and provides no suggestion that the court relied on any reasoning other than the prior decisions, which in turn did not apply *Boyde*.

Furthermore, the sole reliance on its prior decisions strongly suggests that the state court failed to consider the jury instructions in the context of the entire proceeding. *See Boyde*, 494 U.S. at 378, 110 S.Ct. 1190 ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.") Such a failure to conduct the inquiry in the context of the entire proceeding would also be a violation of *Boyde*. In this case, the state court made no reference to the verdict slip or to other parts of the jury instruction, which differed from those in *Frey*. While the state court is not required to provide a detailed explanation of its reasons for denying the claim, the lack of any mention of the other aspects of the proceeding bearing on the issue of potential jury confusion suggests a failure to follow this requirement of *Boyde*. At the very least, the lack of any reference to the context of the proceeding reinforces the conclusion that the state court did nothing more than rely on its prior decisions without applying the standards established by the United States Supreme Court in *Boyde*.

Accordingly, the Court concludes that the state court relied solely on its prior decisions in *Frey* and its progeny, and thus failed to utilize the proper legal standard as dictated by the United States Supreme Court in *Boyde*, which was clearly established federal law at the time that Petitioner's direct appeal was decided. Because the state court applied the incorrect legal standard (and thus performed the wrong legal inquiry), the decision of that court is contrary to clearly established federal law.

### 3. Plenary review

Because the Court concludes that the Pennsylvania Supreme Court's failure to apply *Boyde* was contrary to clearly established federal law, the Court is not constrained by the deferential standard of section 2254(d)(1). *See Williams*, 529 U.S. at 406, 120 S.Ct. 1495. The Court has an obligation to review the claim independently to determine whether habeas relief is warranted. *Rose v. Lee*, 252 F.3d 676, 689 (4th Cir.2001).

 The jury in this case was instructed that there were two ways in which it would be required to reach a sentence of death: (1) "if you unanimously find at least one aggravating circumstance and no mitigating circumstance"; or (2) "if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances." N.T. 7/16/88 at 1812; Verdict Slip at 3. The jury rendered its sentence on the basis of the first of these options, finding two aggravating circumstances and no mitigating circumstances.[20] Verdict Slip at 3.

Petitioner's primary contention is that the instructions suggested to the jury that it had to find mitigating circumstances unanimously. In particular, Petitioner argues that the sentencing court's repetitive instructions as to the differing burdens of proof for aggravating and mitigating circumstances, combined with the court's silence as to other possible differences between aggravating and mitigating circumstances, would lead the jury to infer that the methods of proof were otherwise identical—in other words, that mitigating circumstances also had to be proven unanimously. The problem was compounded, Petitioner contends, by the "promiscuous" use of the pronoun "you," which failed to distinguish between the unanimous jury and the individual juror. If the jury would have believed that it had to be unanimous with respect to mitigating circumstances, and if some but not all of the jurors agreed as to the existence of a particular mitigating factor, then individual jurors would be prohibited from considering the mitigating factor in violation of *Mills* and the Eighth Amendment.

In this case, the trial court never explicitly instructed the jury that it had to find

---

**20.** During the penalty phase, Petitioner's counsel presented evidence of mitigating circumstances, mostly in relation to Petitioner's history of learning and social disabilities. Petitioner's mother, Bonnie Hackett, testified to Petitioner's history of testing and diagnosis of learning disabilities. N.T. 7/15/88 at 1614 (diagnosed with severe problems with perception and conception); N.T. 7/15/88 at 1614 (transferred to Ashbourne School for children with disabilities); N.T. 7/15/88 at 1615–15 (independent evaluator recommended against transfer to mainstream school); N.T. 7/15/88 at 1617–18 (functioning at low average range of intelligence); N.T. 7/15/88 at 1623 (alcohol abuse around 1985–86 timeframe); N.T. 7/15/88 at 1625–26 (upset by brother's drug abuse problems); N.T. 7/15/88 at 1637 (social as well as intellectual problems). A neighbor and family friend, Ann Marie Clay, also testified regarding Petitioner's disabilities. N.T. 7/15/88 at 1645.

Dr. Albert Levitt, the court psychologist, testified at length regarding the various psychological tests he performed on Petitioner. N.T. 7/15/88 at 1653–70. Levitt testified that the tests showed "very regressed, immature perception of reality situations, which is a sign of immaturity and possibly illness."

N.T. 7/15/88 at 1659. Levitt explained that the tests demonstrated a low level of maturity and signs of depression and suicidal problems. N.T. 7/15/88 at 1662. Levitt concluded Petitioner "was limited in terms of coping mechanisms, limited in terms of the way he functions, limited in understanding social relationships. There was a significant degree of psychopathology ... with a lot of morbid and negative thought processes." N.T. 7/15/88 at 1665. Levitt also described the results of the standardized Minnesota Multiphasing Inventory, a computer-graded true/false test. The test results indicated, "Limited interpersonal resources. High clinical depression, ... Projective of blame and hostility. Paranoid features.... Look for delusions of persecution and maltreatment. May have a thought disorder." N.T. 7/15/88 at 1666–67. Levitt concluded that, "[H]e is an emotionally disturbed individual, especially when he has to interact in social situations. [I]f he has to interact socially, he tends to get anxious, confused and develops all kinds of distorted ideations." N.T. 7/15/88 at 1668. Levitt further noted that "Alcohol would have a significant effect on him ... His perceptions of reality are not good in the first place, and alcohol would cause all these things to become more distorted." N.T. 7/15/88 at 1670.

mitigating circumstances unanimously, or that it did not have to find mitigating circumstances unanimously. Any ambiguity with respect to the unanimity requirement would, of course, be clarified with an explicit instruction that unanimity is not required, and would help eliminate the danger of a *Mills* type problem.[21] *See, e.g., United States v. Flores,* 63 F.3d 1342, 1375 (5th Cir.1995) (upholding instructions where court repeatedly told the jury that "all twelve of you do not have to agree as to a mitigating factor. Only one of you has to be persuaded ..." and stressed several times that "under no circumstances do you ever have to recommend death. Under no circumstances. In order for death to be recommended, all twelve of you must agree.") Nevertheless, there is no direct requirement that the trial court provide such an instruction. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("The State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.") Numerous appellate courts have upheld jury instructions where the trial court failed to provide an explicit statement that unanimity is not required with respect to mitigating circumstances. *See, e.g., Duvall v. Reynolds,* 139 F.3d 768, 791–92 (10th Cir.), *cert. denied,* 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998); *Smith v. Dixon,* 14 F.3d 956, 981 n. 15 (4th Cir.(en banc)), *cert. denied,* 513 U.S. 841, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994); *Griffin v. Delo,* 33 F.3d 895, 905–06 (8th Cir. 1994), *cert. denied,* 514 U.S. 1119, 115 S.Ct. 1981, 131 L.Ed.2d 869 (1995).

The lack of a specific requirement to provide an explicit instruction that unanimity is not required does not, however, eliminate the *Mills* problem if the instructions themselves create the suggestion of unanimity. Considering the same instructions as in the instant case, the Third Circuit held in *Frey v. Fulcomer* that the instructions suggested to the jury that it needed to find particular mitigating circumstances unanimously in order to consider them in its deliberations.[22] *Frey,* 132 F.3d at 923. The Third Circuit observed that "read in its entirety, the relevant portion of the jury charge emphasizes the importance of a unanimous finding, using the phrase frequently and in close proximity to ... the mitigating circumstances clause.... Considering this close proximity ... it is quite possible that a juror would, regardless of other qualifying language, believe that mitigating circumstances had to be found unanimously." *Id.* The Court further observed that the sentencing court increased the likelihood of this confusion by distinguishing between the relevant burdens of proof relating to aggravating and mitigating circumstances, but not making any other distinctions between them. *Id.* at 923. The instructions given in Petitioner's case present the same infirmities present in *Frey v. Fulcomer.*

This Court's inquiry does not end with *Frey,* however. In considering a claim of jury confusion, the Court must consider the instructions in the context of the entire proceeding, and not in isolation. *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190. Thus, the Court must also look at the remainder of the proceeding, namely the other parts of

---

**21.** Pennsylvania subsequently modified its proposed verdict sheet in 1989 to make explicit that mitigating factors do not need to be found unanimously. *See* Pa.R.Crim.P. 358A.

**22.** *Frey* and the instant case differed factually in that in *Frey,* the jury found at least one

mitigating circumstance, thus clearly implicating the "weighing" portion of the penalty statute. *Frey v. Fulcomer,* 974 F.2d at 365 n. 18. In the instant case, the jury delivered its verdict on the "no mitigating circumstance" prong of the statute.

the jury charge and the verdict forms provided to the jury.

Beginning first with the remainder of the trial court's charge, the Court agrees with Petitioner that the instructions further confuse, rather than clarify, the issue of whether unanimity is required with respect to mitigating circumstances, and further suggest that the jury would have understood that they needed to agree unanimously to particular mitigating circumstances. The trial court's sole explanation of the difference between the jury's determination of aggravating and mitigating factors, for example, was the following:

The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. As you will recall, I defined that term for you. The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side.

N.T. 7/16/88 at 1811. This instruction was neither preceded nor followed by any other explanation of the difference with respect to jury unanimity in finding such factors. In listing and discussing the possible aggravating and mitigating circumstances, the trial court never clarified to the jury how unanimity applied to each set of factors. The suggestion of the instruction is that the only difference between aggravating and mitigating circumstances is the burden of proof. This would reinforce the notion that mitigating circumstances—like aggravating circumstances—had to be found unanimously.

In a subsequent instruction the trial court suggested that unanimity was required for all findings in even more explicit terms. The trial court instructed the jury that:

Ladies and gentlemen, finally, after conscientious and thorough deliberation, *if you are unable to agree on your findings and verdict,* you should report that to me. If in my opinion further deliberations · will not result in a unanimous agreement on the sentence, whichever it may be, it will be my duty to then impose a sentence upon the defendants individually or collectively of life imprisonment.

N.T. 7/16/88 at 1812–13 (emphasis added). This is an explicit statement instructing the jury that it had to be unanimous with respect to its findings as well as its verdict.[23]

The verdict sheet provides an even stronger suggestion that unanimity in finding particular mitigating circumstances was required. The verdict sheet is a particularly important consideration in determining possible jury error in interpreting instructions because there is no extrinsic evidence of what the jury actually thought, and so the court is left with only the verdict form and the judge's instructions. *Mills,* 486 U.S. at 381, 108 S.Ct. 1860. In the instant case, the verdict sheet contained a specific checklist of findings, and the jury was instructed to complete the sheet by listing its findings on the jury sheet. Verdict Sheet at 1 ("We, the jury, enpaneled [sic] in the above entitled case, having heretofore determined that the defendant, is guilty of murder of the first

---

**23.** The Commonwealth contends that the general instruction regarding consideration of all evidence of mitigating factors clarified the requirements with respect to mitigating circumstances. The Court disagrees. The cited instruction makes no reference to unanimity, and never indicates whether such consideration of all evidence referred to jurors individually or the jury as a collective. *See* N.T. 7/16/88 at 1811 ("All the evidence from both sides, including the evidence you heard earlier during the trial in chief, is important and proper for you to consider.").

degree, do hereby find:"); N.T. 7/16/88 at 1812 ("You will be given a verdict slip, which you will refer to ... upon which to record your verdict and findings. You will follow the directions on the verdict slip and do whatever is required.") The form makes no distinction between aggravating and mitigating circumstances with respect to the burden of proof or unanimity. *See* Verdict Sheet at 1–2. The verdict form contains no space for the jurors to indicate how many of them agreed to the existence of a particular factor (if they were not unanimous). *Id.* Encountering the ambiguous instructions regarding unanimity with the verdict form with a series of checkboxes, a jury might very well conclude that, in order to "find" a particular factor and check it off, the jury had to be unanimous. Thus, the form strongly suggests that unanimity is required in reaching mitigating circumstances.[24] *See Gall v. Parker*, 231 F.3d 265, 327 (6th Cir.2000) (concluding, notwithstanding lack of a specific instruction that jury needed to find mitigating circumstances unanimously, that in case involving a "yes"-"no" format checklist, it was "quite probable" individual jurors would believe themselves precluded from giving effect to mitigating factors that were not found unanimously).

Thus, considering the language of the particular instruction, the additional instructions, and the verdict form, this Court concludes that it was at least reasonably likely that the jury understood that it had to find mitigating factors unanimously in order to consider them in its further deliberations. The close proximity of the term "unanimous" to "mitigating factor" itself strongly suggests—as the Third Circuit observed in *Frey*—a unanimity requirement. The verdict form and the additional instructions further bolster that conclusion.

The Commonwealth presents a somewhat different theory, however, which relies not on the issue of the requirement of unanimity in finding mitigating circumstances, but rather on the issue of unanimity as to the *rejection* of mitigating circumstances. As the Commonwealth points out, the jury in this case delivered its verdict on the basis that there was "at least one aggravating circumstance and *no mitigating circumstance*," rather than on the basis that "one or more aggravating circumstances ... outweigh any mitigating circumstances." The Commonwealth argues that the "no mitigating circumstance" part of the statute explicitly requires a jury be unanimous with respect to the *rejection* of mitigating circumstances. Thus, the structure of the instruction acts as a safeguard, because a single juror who believed that a single mitigating circumstance existed would force the jury to move to the 'weighing' stage of the process. The Commonwealth contends that any error under *Mills* would thus be "immediately averted" and the jury would

---

**24.** The specificity of the verdict form used in *Hackett* distinguishes the case factually from other cases upholding similar instructions, including *Commonwealth v. Frey*. In *Frey*, the verdict slip contained the then-standard Pennsylvania language for the verdict, *Frey*, 554 A.2d at 31 n. 2 (reproducing verdict slip), but contained no checklist for the jury to list any mitigating circumstances it had found. *Id.* at 32 ("Appellant contends that the verdict slip employed in the penalty phase of trial was defective in that it *did not* require the jury to list any mitigating circumstances it found.")

(emphasis added). *See also Scott v. Mitchell*, 209 F.3d 854, 873–74 (6th Cir.2000) (no findings checklist); *Duvall v. Reynolds*, 139 F.3d 768, 791–92 (10th Cir.1998) (requiring jury to indicate findings for aggravating factors but not for mitigating factors); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 308 (3d Cir.1991) ("Though the jury was obliged to specify the aggravating circumstance it found, it had no such duty with respect to mitigating circumstances, thus suggesting that consideration of mitigating circumstances was broad and unrestricted.").

never be artificially precluded from considering all mitigating evidence. *Id.*

The application of the Commonwealth's theory is limited to cases, like this one, in which the jury delivers its verdict on the "no mitigating circumstance" prong of the statute. Under this theory, even if the jury understood that it had to be unanimous in order to find a particular mitigating circumstance, by rendering a verdict under the "no mitigating circumstance" prong it would not be prevented from considering mitigating evidence in violation of the Eighth Amendment because it would also have unanimously rejected the existence of any mitigating circumstances. The Commonwealth's interpretation of the "safeguard" under the "no mitigating circumstance" prong depends, of course, on the jury having properly interpreted the "no mitigating circumstance" prong to require the unanimous rejection of the existence of all mitigating factors. Thus, in the context of *Mills* and *Boyde*, the particular danger that must be examined for is whether there was a reasonable likelihood that the jury believed that even if it was not unanimous as to the rejection of mitigating factors, it could still reach a sentence of death rather than moving on to the weighing prong to determine if the aggravating circumstances outweighed the mitigating factors.

Though the Court recognizes that the plain language of the "no mitigating circumstance" prong can be read as the Commonwealth interprets it, the Court concludes that it is at least reasonably likely that the jurors misunderstood the instruction, particularly in the context of the rest of the jury charge, in a way that violated *Mills* and *Boyde*. With respect to the specific question of whether the clause requires the unanimous rejection of all mitigating factors, it is simply not clear, in the context in which it was given, whether the instruction means that a death sentence is warranted if the jury unanimously finds at least one aggravating circumstance and unanimously finds that no mitigating circumstances exist (as the Commonwealth contends), or if the phrase means a death sentence is warranted if the jury unanimously finds at least one aggravating circumstance and finds no unanimously agreed upon mitigating circumstances.

The jury's interpretation of the unanimity requirement as to the rejection of mitigating circumstances would depend on how the jury understood and employed the concept of unanimity. If the jury believed that all jurors would have to agree as to the existence of the same particular mitigating circumstance, then the jury could reach a death verdict even if individual jurors believed mitigating factors existed, so long as all the jurors did not agree as to the existence of a particular mitigating circumstance. Such a jury would meet the requirement of the "no mitigating circumstance" prong on the basis that all the jurors agreed, unanimously, that there was no mitigating circumstance that was commonly agreed upon by all twelve jurors.

Consider, for example, the following scenario. All twelve jurors agree that a particular aggravating factor exists. Two of the jurors conclude that age is a mitigating factor in the case; however, the other ten jurors do not agree. None of the jurors believe that any other mitigating factors exist, and so the jury is not unanimous as to the existence of the individual mitigating factor. Believing that unanimity is required in order to find that a mitigating factor exists, the jurors "find" one aggravating factor, and fail to find any commonly agreed upon mitigating factors. Rather than moving on to the weighing prong and determining if the aggravating circumstance outweighs the mitigating factor, the jury uses its findings and renders a verdict of death on the basis that the jury unani-

mously agreed to the existence of "at least one aggravating circumstance" and that the jury unanimously agreed that there was "no mitigating circumstance" that was commonly agreed upon by all twelve jurors.[25] Notwithstanding the fact that two of the jurors believed that a mitigating factor existed, because of the jury's erroneous interpretation of the instructions with respect to the requirement of unanimity, the result would be a sentence of death.

This scenario even creates the possibility of a death verdict under the "no mitigating circumstance" prong where all twelve jurors believe a mitigating factor to exist, but there is no agreement as to the particular factor. For example, two jurors could believe age is a mitigating factor and the other ten jurors could believe the defendant's lack of significant criminal history is a mitigating factor. All twelve jurors thus believe that a mitigating factor exists, but because they do not all agree as to the same particular mitigating factor, they conclude that there are no commonly agreed upon mitigating factors. Based on their findings, the jurors thus conclude, unanimously, that there are no mitigating factors that were unanimously agreed upon by all the jurors. The jury therefore delivers a verdict of death without ever weighing the aggravating circumstance against the mitigating factors.

In light of all the instructions and the verdict form in this case, the Court concludes that there was a reasonable likelihood that the jury interpreted the instructions in such a way as to preclude its ability to consider mitigating evidence in violation of the Eighth Amendment. *See*

*Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. The ambiguity of the language of the sentencing statute, the additional jury instructions, and the verdict form all contribute to the conclusion that it was reasonably likely the jury believed it must find mitigating circumstances unanimously before considering them, and that it could reach a verdict of death under the "no mitigating circumstance" prong even if one or more jurors believed that a mitigating circumstance existed without performing the weighing inquiry. The result was the unacceptable risk that a juror could be compelled to render a verdict of death even if he or she believed a mitigating factor existed, and that the juror would thus be barred from considering the mitigating factor. This is a violation of the Eighth Amendment and is precisely the danger of which *Mills* and *Boyde* warned. Petitioner is therefore entitled to relief with respect to Claim IV of the Petition.

## IV. CONCLUSION

The Court denies the Petition with respect to claims I, II, III, V, and VI. The Court concludes, however, that the Pennsylvania Supreme Court's adjudication of Petitioner's *Mills* claim (Claims IV) was contrary to clearly established federal law as determined by the United States Supreme Court. The Court determines that there is a reasonable likelihood that the jury interpreted the instructions and verdict form in such a way as to preclude it from considering mitigating evidence in violation of the Eighth Amendment. For those reasons, the Court grants the Petition for writ of habeas corpus as it addresses the sentencing phase of the trial.

---

**25.** Under the Commonwealth's "safeguard" scenario, any time a single juror believed a mitigating factor existed, the jury would move to the weighing inquiry. However, if the jury were to interpret the instruction and the first part of the verdict form as described here, the jury would never get to the weighing inquiry, even though at least one juror believed a mitigating factor to exist, because the jury was not unanimous with respect to the existence of that mitigating factor.

Petitioner's sentence is vacated, without prejudice to the right of the Commonwealth of Pennsylvania to sentence Petitioner to life imprisonment, or to conduct such further proceedings as may be appropriate under state law (including a new sentencing hearing) if initiated within 180 days.